Hospital Systems. I would like to open with a summary of three points to aid this Court in understanding why it is that the Board should be reversed. The first point concerns claim construction. During re-examination, independent claims 3 and 20 were amended with explanations and declarations were submitted, but the Board did not give weight to the intrinsic evidence and for that reason should be reversed. The second point that I would like to highlight in summary, it concerns obviousness. The scope of the claims construed in light of the intrinsic evidence requires that a label be applied automatically to a syringe. The Spaulding combination of prior art prints all labels to an outboard printer, and that requires that the labels be matched to the vials that have been filled and manually applied to those vials. As properly construed, the claims in this case require the manufacture of a syringe by an automated machine which applies labels and which prepares a syringe ready for administration to patients. The final point also relates to obviousness and that really under either party's interpretation of the claims, the claim feature of a filtered output stream consisting of only those jobs that require manual handling is not fairly met by the Spaulding combination of references or sites to error messages which include system errors and automation errors. But those errors are not limited to only jobs that require manual handling. Can I ask this? Tell me what's wrong with the following, that the claim construction dispute doesn't actually have to be resolved and doesn't add anything because if you had an obviousness case for filtered streams getting even to the point of printer, the only thing that's left in the claim construction dispute is the automatic attachment to the syringes and you've contended that that's well known. So that the dispute over whether automatic attachment of labels to syringes is required by the claims or not doesn't actually change the result of the obviousness analysis. Why is that wrong? I submit that it's wrong because the fundamental teaching of Spaulding is that all of the labels go to an output printer and the modification that's been proposed in view of secondary references still does not result in a label being applied. Apelli hired an expert who gave an opinion as to how Spaulding operates. He's an electrical engineer with great credentials and he did not provide any explanation as to how Spaulding might actually be changed in its principle of operation to print only some of the labels. His testimony almost substantially mirrors what the board of directors said. I'm trying to separate the question of attaching labels, automatically attaching labels to syringes from the question of printing only the ones that are going to be attached automatically. So there's no teaching in the art of record of modifying Spaulding to put a label on the syringe. If there were a labeling station in Spaulding that were able to apply a label to a syringe, then it would produce a labeled syringe. But Spaulding teaches a different way. There's a host computer and there's a label printer and the Spaulding system has been interjected into the flow and the teaching from top to bottom of Spaulding is that pharmacist is there and it's the expectation from the teaching of Spaulding. The pharmacist is going to retrieve from an offload carousel the filled vials for applying the label. And in that dispensary system, the pharmacist is able to look at the filled vial. These vials are filled with pills, so pills have shape, size, color, markings, things that the pharmacist can confirm as being correct and related to a label. But Spaulding is a decidedly more complex system. It's going to make everything that the pharmacist needs in order to do his job and it doesn't purport to divide the flow, as in the claims invention, to two distinct paths which are mutually exclusive. In all of its teachings, pharmacist co-mingles its output. On the primary side, all of the labels are going to a label printer, an outboard label printer. When you look at the modification which takes the display and changes that to a printer, the so-called filtered output which Spaulding is providing is going to, instead of a display, to a printer. But what is that filtered output? The claim calls for a filtered output stream which consists of only those jobs that require manual handling. But the Spaulding provides outputs of concerning things that have been automatically handled. It has an output that says the offload carousel is full. It has an output that says that there's a count discrepancy or a weight discrepancy. Spaulding discloses at page 54, column 9, lines 32 through 38, a number of different error messages which are not restricted to jobs that require manual handling. But in fact, virtually all of them concern automated errors. And so Spaulding is not sending only jobs that require manual handling to the display now as modified to a printer. Another problem with the modification that suggests that maybe we can apply the labels directly automatically in Spaulding which Dr. Trumper never addresses is that Spaulding in and of itself is proposing a system that is supposed to be assisting the pharmacist. If he were applying the labels directly, he would end up with duplicate printing because the main printer is getting the jobs the machine cannot handle. Before you get to any modification, you look at the teachings of Spaulding, in all fairness, the display is it's only a display and it's showing error messages, problems in handling. If the pharmacist is pressing print and expecting labels for the medications that have to be filled, it's wonderful that the Spaulding machine can fill some of those orders. And if Spaulding were to apply a label, that might be interesting. But the premise then is that Spaulding is something that the machine can control over these flows and the pharmacist would never have a printed label for the things the machine could not do. And that would make Spaulding inoperable for its intended purpose because the pharmacist can keep pushing print and not seeing the jobs he has to do. By contrast, that's our invention. Our invention has mutually exclusive streams flowing in different directions, one to an output to a printer and one to an automated machine. I submit that the board erred in construing the claims in a vacuum. They looked at the word that after the amendment that was made during prosecution, they looked at the word manufacturer instead of the manufacturer manufacturing syringes for delivery and administration of patients. That was the phrase that was amended to change the scope of the claim from before, which was preparing medication doses. They looked at the one word. They didn't provide a specific meaning for the claim language. Pelley's brief notes at page 16 that it seems that the board used the plain and ordinary meaning and we concur. And so doing the board disregarded the testimony of Blair who gave an understanding of what the patent itself teaches people of ordinary skill in the art and his commentary on the board's decision. They also disregarded the arguments that were made by the patent owner during the re-examination at the very time of the amendment that said manufacturing syringes for delivery and administration for patient means that you're implicitly that you're applying a label. And that was backed by the declarants who said, for safety's sake, a machine like this has to have it. It was consistent with the specifications teaching that the order entry system communicates with the medication preparation system and gives it the information that it needs, that's the word in the spec at, well, I don't have to spell it, but the specification needs to have that information in order to be able to print a label. That's at column 3, lines 30 through 47 of 837. So the specification supports an understanding that a person of ordinary skill in the art recognized and applied. Blair said, I read the 212 patent and it implicitly describes, it inherently describes a labeled printer and the application of labels. The amendments during prosecution are clear and unmistakable that the intention of the claimed language of the amendment was to narrow the scope of the claims and define it as applying a label. We went so far as to say that while we didn't have IPSS's verbose support for a second printer, we were relying on language that a person of ordinary skill in the art recognized. So what was the impediment to your amending the claims? Because IPSS's verbose support is not required. Correct. So why, it seems, I don't know, not the best way to run the system to opt for, opt against amending claims to achieve what you want and instead make a prosecution history record which will then be binding. Understood. And the binding effect is recognized and was recognized at the time and we were unabashed in making that position clear on the record. This was an inter-parties re-examination and at every stage the appellee was commenting and critiquing every single maneuver as it has the right to do. And they commented and actually made, and they would have done that regardless of the nature of the support, especially had we come in and said, you know, brought in a second printer in so many words. That is why the claims were amended as such. That's why the remarks were made. Blair was discounted as having no real weight, apparently because he didn't use the magic language of the claims. The claims track the discussion provided by Blair. That's the meaning of a person ordained to a skill in the arts, uncontroverted on the record. You're into your rebuttal, why don't we hear from the other side. Thank you. Your Honors, may it please the Court, my name is John McClain. Even if Claims 3 and Claim 20 are construed for the sake of argument, according to appellant's construction, they remain obvious over the record, over the prior art of record based on the Board's previous findings. I'd like to make three brief high level points about obviousness before getting into details. The first is that the appellant has failed to address the combination of Spalding with Halverson and the other prior art references and none of the declarations from any of the appellant's experts addressed obviousness. All they have is attorney argument. And then third, our position is supported by an expert witnesses declaration that goes into detail about all of the references. That's Professor Trumper, a professor at MIT. I'd like to talk in a little bit more detail about the Spalding reference and the Halverson reference. It's important to always keep in mind that this is an obviousness issue and that there are multiple references involved. Both parties agree that Spalding shows a printer and a display panel and appellant's construction of the claims requires two printers, but it doesn't address whether or not that combination is obvious in light of Spalding and Halverson. So Spalding discloses a controller that sends an error message to a display panel when a drug is not in the system. Halverson also has a system for dealing with prescription drug orders that have to be manually filled. And so that's discussed in Halverson, which is at JA 100 and in particular column 5, lines 10 through 16. So Halverson discusses prescriptions that can be automatically prepared and then discusses those that result in manual preparation being necessary. And so anything that is lacking in Spalding is filled in by Halverson. And that is discussed in detail in Professor Trumper's declaration paragraphs 21 through 26. So even if all of the labels, if you were to look at figure 30 and take sort of a simplistic interpretation of that and look at it in the abstract and you look across that first row and view that as sending all the labels to the printer, it wouldn't matter because in figure 29 you have the loop that is shown and it's described in two places. The first is at JA 56, column 14, lines 47 through 18. And that describes figure 29 in detail. And then also in JA 53 through 54, column 8, line 63, column 9, line 11. And that section describes the temporal aspect of the diagrams that are shown. But it has to be kept in mind that both figure 29 and figure 30 are referred to as simplified versions and you can't understand how they work just by looking at them. You have to read the two together and in line with the specifications, particularly the sections that I just cited to. And what becomes apparent after reading those sections is that there is a description of the flow of the prescription label data that shows the temporal aspect to it before it is printed. And that is the interpretation that the board accepted. But it doesn't matter if that is not what you agree with because either way there is a separation that occurs that's shown very clearly in figure 29 in the loop that is shown where you get down to is the drug in the system and if it's not then it gets kicked out and goes to the display panel. And so the question for obviousness is just a simple question of would it be obvious to substitute the display panel with a printer as shown in Halverson. Halverson shows in figure 1 a system that's used in a pharmacy, a network system with a plurality of printers and one of the printers works with the prescription drug orders that are being sent and printed informing a worker that the prescription needs to be handled manually. So that combination is the reason why claims 3 and claims 20 are obvious. Dillon relates to a TCP IP protocol that shows in figure 30 one of the arrows that's shown as unidirectional. It clarifies that it would be clearly bidirectional because the Spalding reference makes reference to the use of conventional printer networks and Dr. Trumper explains that that would of course be a bidirectional connection. So the figure 30 is not a complete representation, but it can be fully understood by looking at those two sections in combination and the figures in combination. So I mentioned that, well, excuse me, controller 7 of Spalding filters the drug orders between those that can be filled by the automated system and those that are unsuitable for automated handling. This separation of the manually filled drug orders from the drug orders received by the Spalding system is a filtering operation and that's what Dr. Trumper stated in his declaration at A343 paragraph 16 and Appellate has no expert testimony to refute this view. Appellate criticized Professor Trumper's statement in A343 paragraph 18 that Spalding never states that all the labels for automatically filled prescriptions and manually filled prescriptions are printed by the label printer. But in the next sentence, Professor Trumper goes on to affirmatively state that the simplified flow diagram does not provide that all prescription orders are sent to the label printer. He then concludes that a skilled artisan would understand that more than one printer could be connected to the Spalding system and that's at J343 paragraph 18. So Professor Trumper's declaration provides substantial evidence to support the board's findings which a reasonable mind might accept. In contrast, Appellate has no declaration evidence that supports an argument regarding obviousness, just attorney argument. I'd like to comment briefly on some of the claim construction issues if there's no questions about obviousness. So the PTO has to follow the broadest reasonable interpretation and the... Can I just ask you the same question I asked your opposite number? If you're right about the obviousness analysis up to this point, what role, if any, is played by the claim construction dispute? Well, I would say that it has no role because either way that you interpret, you construe the claims, really all that matters is that there is a filtering that occurs and that filtering occurs as clearly shown in figure 29 with the output that goes to indicate that there's not a drug in the system and that it can't be filled. And then you combine that teaching with the similar teaching in the Halverson reference there at column five that I cited to you earlier which shows similarly when you have a drug that can't be automatically filled that you print out a message indicating that it needs to be handled manually. That would show the use of two printers and it just wouldn't matter if you construe the claim to be the case that all the labels are printed all at once with no analysis and ignored the lower part that's shown in figure 30 and ignored the discussion about how the prescription label data has to go down to the database and then from the database go back up. You'd still have a filtering that occurs and so it would be obvious either way. I'd like to point out the Omega v. Raytech case which explains, it's cited in our brief, which explains how you can't use expert declarations to rewrite the specification. The problem with that is that where do you stop becoming untethered from the requirements of the written description and it just opens up a can of worms. Do you think that there would have been sufficient support in the specification for them to do by explicit amendment what they so clearly tried to do by argument to the examiner? No, I don't. The word manufacturing is used ambiguously, but I think we all understand what is meant by manufacturing, but beyond that, when it details, there's just no detail there. It opens up to too many alternative versions of what that might be with no basis. If more detail is needed presumably for enablement or what? Well, I think that you have to have enablement for this certainly, but also written description and so there's just ambiguity. They try to tie it to a particular commercial embodiment and the board found that that really just, let me find the exact phrase that the board used. The board said that by no means the only configuration possible or required and so by attempting to refer to a commercial embodiment, it creates ambiguity because you can't rely on that for what is meant by the patent terms and it just has too much ambiguity. So, in conclusion, I ask for the court to affirm. Thank you. Apelli mentions Omega, the Omega case. I think that the NTP case is more appropriate. NTP came after re-examination and had this court reviewing the board's decision and in NTP, this court said that the intrinsic record includes what a person with ordinary skill in the art would understand a claim to mean. The purpose of Blair's submission was to provide such information to the record and that's in addition to the clear and unmistakable statements that were made during prosecution. Particularly in view of issues concerning the actual words that appeared in the patent to address the meaning of the patent to a person of ordinary skill in the art. So, Apelli suggests that the flow diagram of Figure 29 is dispositive of the flow being divided. Dr. Trumper refers to that figure. The figure doesn't show all these other arrows that say, let's send a message to the exact same location if the offload carousel is filled. Let's send the same message if there's a count discrepancy. Things that concern automated functions. It is an illusory and a misreading of the claim to talk about filtered output without looking at the entire phrase, a filter output stream consisting of only those jobs that require manual handling. With all due respect to Dr. Trumper, he refers only to Figure 29 and not to the disclosure of Spaulding, which includes numerous error messages going to the exact same place, now going to paper about my machine is dirty, the count is wrong, the carousel is full, all sorts of things that require automated handling. My time is up. Thank you. We thank both counsel the case is submitted and that concludes the proceedings for this morning.